*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* Guardianship of CY.

CY, a legally protected person,

     Appellant,

v

LESLEY YULKOWSKI, PATRICIA
YULKOWSKI, LISA YULKOWSKI, LEON
JUKOWSKI, and THOMAS BRENNAN FRASER,
Guardian,

     Appellees.

FOR PUBLICATION
June 12, 2025
9:47 AM

No. 370828
Oakland Probate Court
LC No. 2023-411644-GA

Before: YATES, P.J., and YOUNG and WALLACE, JJ.

YATES, P.J.

CY, a legally protected person, has three daughters and one son. Her son, Leon Jukowski, was assigned primary responsibility for her care as a patient advocate. In January 2023, the three daughters sought the appointment of a guardian of an incapacitated individual in the probate court, alleging that CY suffered from dementia and cognitive issues, and asserting that Jukowski, as the self-appointed power of attorney, was not acting in CY's best interests. The trial court granted the petition and appointed a professional guardian for CY. On appeal of right, CY insists that the trial court had no basis to supplant Jukowski with a professional guardian. We affirm.

## I. FACTUAL BACKGROUND

This case arose out of an intrafamilial dispute among the children of then-93-year-old CY, i.e., Lesley Yulkowski, Patricia Yulkowski, Lisa Yulkowski (collectively, the daughters), and her son, Leon Jukowski. The conflict surfaced after the death of CY's husband on December 29, 2022. The daughters had concerns about how Jukowski—who was CY's patient advocate with power of attorney for health care—provided for CY and her extensive needs due to her declining health.

On January 25, 2023, the daughters filed a petition seeking the appointment of a guardian of an incapacitated individual in the probate court, asserting that Jukowski, as self-appointed power of attorney for CY, was not acting in the best interests of CY. The petition cited multiple incidents of neglect, coercion, and financial abuse over a period of several years. The petition claimed that when one of the daughters visited CY's apartment in December 2022, she noted that the apartment was filthy, and CY and her husband were in dire condition. The daughters feared that such abuses would increase after the death of CY's husband. In addition, Jukowski allegedly told the daughters that he did not intend to make sure that CY was eating sufficiently or wearing clean diapers. The daughters further alleged that, on several occasions when one of the daughters accompanied CY to physicians' appointments, it was obvious that CY was not receiving proper care. Beyond that, CY's caregiver, 70-year-old Samuel Scott, could not provide adequate care for CY. Thus, in the petition, the daughters requested that Lesley Yulkowski be appointed full guardian with all powers provided by statute.

In February 2023, CY (through counsel) filed an objection to the petition for guardianship, denying she was legally incapacitated, but indicating that if she was deemed in need of a guardian, she wanted Jukowski to serve in that fiduciary capacity.[1] CY explained that on May 10, 2018, she executed a patient advocate designation (PAD) listing Jukowski as the successor patient advocate upon her husband's death. Also, CY insisted that, under MCL 700.5313(2)(b), Jukowski was first in priority to act as her guardian because CY had repeatedly expressed her preference for Jukowski to act on her behalf. CY attached a copy of the executed PAD to her objection. Further, CY stated that if the trial court chose not to appoint Jukowski as her guardian, Michael F. Golab, an attorney with Butzel Long and CY's successor patient advocate after Jukowski, was the correct party to act as her fiduciary under MCL 700.5313(2)(b) because Golab was responsible for the management of the financial affairs of CY and her husband, and Golab maintained a durable power of attorney (DPOA). Alternatively, CY noted that Amy Glenn, CY's "long-time attorney and the trustee of [CY's] trust . . . is another possible candidate to act as Temporary Guardian pending adjudication of this matter."

The trial court received motions, reports from a guardian ad litem, and other documents, and then it conducted a two-day evidentiary hearing in February 2024 to consider the petition filed by the daughters. The parties presented testimony from the three daughters and Jukowski, as well as medical records and other exhibits. On April 17, 2024, the trial court issued a 13-page opinion and order granting the petition to appoint a guardian for CY. The trial court determined that it was undisputed that CY qualified as an "incapacitated individual" under MCL 700.1105(a) due to her "dementia/cognitive issues," and need for "24/7 care and assistance in all aspects of daily living." The trial court recognized that, under MCL 700.5313(2), Jukowski would have the highest priority to serve as guardian because he was CY's patient advocate, but it was nonetheless within the trial court's "purview to examine the qualitative circumstances of the relationship between [CY] and

---

[1] The objection incorrectly referred to Leon Jukowski as "Leon Julkowski" from beginning to end. That matters because it suggests that either CY no longer knew her own son's name, or CY never even read the objection that her attorney submitted on her behalf.

the individual having statutory priority for appointment." The trial court found that Jukowski had repeatedly failed to cooperate with the daughters, contrary to the best interests of CY.

The trial court further explained that, although Jukowski claimed he withheld CY's medical information to respect CY's privacy, "[CY's] health and well-being has declined to the extent that she requires around-the-clock care," so further involvement from the daughters was pertinent. The trial court described Jukowski's "laissez faire" approach to CY's care as inappropriate, considering CY was "a 93-year-old woman experiencing memory issues and cognitive decline" with extensive needs. The testimony revealed that CY was left without proper supervision on several occasions, she was receiving inadequate nutrition, and she was found wearing a soiled diaper in an unclean residence. Finally, Jukowski's employment of Scott as CY's caregiver was concerning, especially because there were numerous occasions when Scott was asleep when the agency caregivers failed to attend their daytime shifts, and Scott lacked formal training in elder care.

Based on the evidence before it, the trial court opined that CY required greater supervision than Jukowski was willing or able to provide, and "[CY] needs a guardian and Leon Jukowski is unsuitable to be appointed in that capacity." But because the evidence reflected that CY "did not want her daughters to serve as decision-makers relative to her medical care[,]" it was contrary to CY's best interests "to appoint a guardian to which she objects." Hence, the trial court concluded: "There being no other person with higher priority willing or able to serve, the Court may appoint a professional guardian under MCL 700.5313(4)." Accordingly, the trial court appointed Thomas Brennan Fraser "to serve as guardian and determine a proper level of care for [CY] that will serve her best interests and foster cooperation and involvement by her children." In response, CY filed this appeal of right.

## II. LEGAL ANALYSIS

On appeal, CY contests the trial court's decision to appoint a professional guardian for her when Jukowski was properly furnishing care for CY as her patient advocate and DPOA concerning medical decisions. A probate court's decisions "are generally reviewed for an abuse of discretion." *In re Estate of Huntington*, 339 Mich App 8, 17; 981 NW2d 72 (2021). "An abuse of discretion occurs when the decision resulted in an outcome falling outside the range of principled outcomes." *Id*. (quotation marks and citation omitted). But "[a] court necessarily abuses its discretion when it makes an error of law." *In re Guardianship of Gordon*, 337 Mich App 316, 318; 975 NW2d 114 (2021). "We review de novo issues of statutory interpretation, which are questions of law." *In re Conservatorship of Murray*, 336 Mich App 234, 240; 970 NW2d 372 (2021). "This Court reviews the probate court's findings of fact for clear error." *Huntington*, 339 Mich App at 17 (quotation marks and citation omitted). "A finding is clearly erroneous when a reviewing court is left with a definite and firm conviction that a mistake has been made, even if there is evidence to support the finding." *Murray*, 336 Mich App at 239-240 (quotation marks and citation omitted). Applying these standards, we must consider CY's challenges to several rulings of the trial court, beginning with the trial court's decision to appoint a professional guardian for CY.

## A. APPOINTMENT OF A GUARDIAN

Pursuant to the Estates and Protected Individuals Code (EPIC), MCL 700.1101 *et seq*., "a probate court may appoint a guardian to be legally responsible for an incapacitated individual." *In*

*re Guardianship of Malloy*, 513 Mich 148, 155; 152 NW3d 152 (2024). Under MCL 700.1105(a), an "incapacitated individual" is defined as a person "lacking sufficient understanding or capacity to make or communicate informed decisions." A probate court has the power to appoint a guardian for an "incapacitated individual" if it finds, by clear and convincing evidence, "the appointment is necessary as a means of providing continuing care and supervision of the incapacitated individual, with each finding supported separately on the record." MCL 700.5306(1).

By all accounts, CY qualified as an "incapacitated individual" under EPIC because of her dementia and chronic health issues, which were substantiated by medical records during the trial-court proceedings. But the parties contest whether the appointment of a guardian was "necessary as a means of providing continuing care and supervision" for CY under MCL 700.5306(1), in light of Jukowski's fiduciary role. We conclude that the trial court did not abuse its discretion by finding that the appointment of a guardian other than Jukowski was vital to ensuring CY's continuing care and supervision. After the death of CY's husband, Jukowski was acting as CY's patient advocate and DPOA. Testimony of the daughters substantiated the allegations in the guardianship petition that Jukowski acted contrary to CY's best interests, and he did not effectively communicate with his siblings and CY's medical personnel. Lesley Yulkowski testified that she noticed CY's health significantly declined after the death of her husband, indicating that CY may be neglected as "[s]he was extremely depleted. Like, she had trouble focusing, she had problems walking suddenly, she was sleeping all the time." After she took CY to see one of CY's physicians, she found out that Jukowski had "fired [the physician] the year before, after it was—after it was found that my mother had a vaginal vault impacted with feces." She further explained that Scott first moved into CY's residence during the summer of 2022 to act as a caregiver, despite Scott lacking any professional qualifications to do so. In February 2023, she saw "feces and urine all over the bathroom" of CY's apartment, and "feces all over the carpeting[,]" in addition to several bottles of vodka. Also, she noticed during her visits to CY's residence that the front door was unlocked, Scott was asleep, and CY was wearing a dirty diaper. Between January 2023 and March 2023, she saw swelling in CY's legs because CY was not wearing the recommended "leg wraps" intended to address the swelling, and CY was not taking her required blood-thinner medication.

Lesley Yulkowski further testified that the professional agency caregivers failed to attend their shifts on numerous occasions in March 2023 and April 2023, but Jukowski did not promptly inform her about that. Beyond that, although Jukowski provided her with a list of CY's physicians pursuant to a February 22, 2023 court order, when she contacted CY's physicians, she discovered that only two of the five physicians were actively seeing CY. CY required a podiatrist to address issues pertaining to her feet, and Lesley Yulkowski noticed CY's feet "were harrowing. Her nails were grown well past, curling around her toes, she had an enormous callous . . . on the bottom of her foot[,]" which caused Lesley Yulkowski to schedule a medical appointment because Jukowski failed to do so.

Patricia Yulkowski testified that she had concerns about CY's weight loss and cleanliness, in addition to a number of bruises on CY. Patricia Yulkowski was also worried about CY's water consumption because "her skin is really dry, super dry, and scaly," and there were several instances when CY was hospitalized without Patricia Yulkowski's knowledge because Jukowski did not tell her about that. Lisa Yulkowski stated that she joined her sisters in filing a petition for guardianship because, "when I was visiting [CY], around the time my dad died, the apartment was very, very dirty and smelly[,]" and it was apparent from CY's physical appearance that CY was not receiving

adequate care. Lisa Yulkowski stated that she generally visited CY on a daily basis, ensuring that CY was eating properly, and she was worried about the inconsistent presence of the professional caregivers. All that testimony from the daughters supported the trial court's finding that CY was left without proper supervision, CY was receiving inadequate nutrition, and CY was found wearing soiled diapers in an unclean residence while under Jukowski's supervision.

CY further contends that there was insufficient factual support for the trial court's decision to appoint a different person to serve as CY's guardian, as Jukowski's alleged failure to cooperate with his siblings was irrelevant to his ability to fulfill his role as a fiduciary, and CY preferred not to have any of her daughters involved in her care. In addition, CY argues that the trial court failed to honor her preference to designate Jukowski as her guardian.

We acknowledge that CY documented her preference for Jukowski to serve as her fiduciary for medical decisions, as reflected by her objection to the underlying guardianship petition and her designation of Jukowski as her patient advocate. According to MCL 700.5306(2): "If the court is aware that an individual has executed a patient advocate designation under section 5506, the court shall not grant a guardian any of the same powers that are held by the patient advocate." However, MCL 700.5306(5) creates an exception to MCL 700.5306(2), allowing a court to grant powers to a guardian over "treatment decisions that the patient advocate is designated to make" if "the patient advocate is not acting consistent with the ward's best interests . . . ." Hence, the statutory scheme for court-appointed guardianships contemplates that a trial court may appoint a different person to serve as the guardian for an "incapacitated person" who has made a patient advocate designation. Moreover, while a legally protected person has the right to select who will serve as a fiduciary, the Legislature has decreed that the right is restricted to the selection procedure under MCL 700.5313, and whether the requested person is "suitable and willing to serve[.]" MCL 700.5306a(1)(aa).

The appointment of a guardian other than Jukowski was critical to ensure CY's well-being because she lacked adequate nutrition, supervision, and hygiene while under Jukowski's care. The record indicated that CY suffered from significant weight loss, she was unable to ask for food, she suffered from poor hygiene, including soiled diapers, and she had "eloped" from her apartment on one occasion after Jukowski acquired powers as her patient advocate and medical DPOA. While Jukowski described his withholding of CY's medical information as a means of respecting CY's privacy, as the trial court recognized, "[CY's] health and well-being has declined to the extent that she requires around-the-clock care[,]" indicating further involvement from the daughters mattered. *In re Guardianship of Redd*, 321 Mich App 398, 413; 909 NW2d 289 (2017) ("Part of a guardian's responsibility is to provide for the ward's social well-being . . . [but the guardian] was not willing to facilitate these relationships and was, in fact, actively impeding them."). The trial court properly faulted Jukowski's "laissez faire" approach to CY's care because she was a 93-year-old woman who was experiencing notable memory issues and cognitive decline. Further, Jukowski's decision to employ Scott, an untrained 70-year-old man, as CY's primary caregiver was unwise in light of CY's extensive ailments. Accordingly, the trial court did not abuse its discretion, or otherwise err, in concluding that the appointment of a person other than Jukowski to serve as CY's guardian was necessary in order to provide continuing care and supervision of CY.

## B. BEST INTERESTS

CY contends that the trial court abused its discretion by appointing a professional guardian without expressly stating whether it was in CY's best interests to do so. Our review of the record convinces us that the trial court explained how the appointment of a professional guardian was in CY's best interests, so the trial court acted in accordance with MCL 700.5106(2)(a). Hence, we find no abuse of discretion in the trial court's actions.

According to MCL 700.5106, which governs the appointment of professional guardians, a probate court "may appoint or approve a professional guardian," but the court "shall only appoint a professional guardian" if the court finds that (1) "[t]he appointment of the professional guardian . . . is in the ward's . . . best interests" and (2) "[t]here is no other person that is competent, suitable, and willing to serve in that fiduciary capacity in accordance with section 5212, 5313, or 5409." In this case, the trial court did not render best-interest findings during the guardianship hearing, but the court fully explained its rationale in its opinion and order granting the petition for guardianship. After describing the numerous incidents of neglect that transpired while CY was under Jukowski's care, the trial court determined that CY required greater supervision than Jukowski was willing or able to furnish, so "[CY] needs a guardian and Leon Jukowski is unsuitable to be appointed in that capacity." The trial court observed that, because the evidentiary record demonstrated CY "did not want her daughters to serve as decision-makers relative to her medical care[,]" it was contrary to CY's best interests "to appoint a guardian to which she objects." As the trial court put it:

> There being no other person with higher priority willing or able to serve, the Court may appoint a professional guardian under MCL 700.5313(4). The Court will appoint Thomas Brennan Fraser to serve as guardian and determine a proper level of care for [CY] that will serve her best interests and foster cooperation and involvement by her children.

Accordingly, the trial court expressly stated its reasoning for why the appointment of a professional guardian was in CY's best interests, in compliance with MCL 700.5106(2)(a). Thus, the trial court did not commit an abuse of its discretion by selecting a professional guardian for CY.

## C. THE PATIENT ADVOCATE DESIGNATION

CY claims the trial court appointed a professional guardian without adequately considering whether the PAD that CY signed sufficiently satisfied CY's needs. "Broadly stated, a guardianship is one available legal mechanism for ensuring the safety and well-being of individuals who are not capable of independently making decisions and caring for themselves." *Malloy*, 513 Mich at 156. "Other legal options for ensuring the proper care of individuals in need of assistance include, but are not limited to, a 'conservator, patient advocate designation, do-not-resuscitate order, physician orders for scope of treatment form, or durable power of attorney . . . .' " *Id*. at 156 n 5 (quotation marks and citation omitted). Our Supreme Court has acknowledged the impact of a guardianship on the autonomy of a legally protected person, explaining "that appointing a guardian deprives an individual of their legal autonomy, often completely and in extremely intimate ways." *Id*. at 156. CY contends that the existence of a PAD rendered the appointment of a guardian unnecessary and improper because that PAD "authorize[d] her son Leon Jukowski to make comprehensive 'health and personal care decisions' and all of her financial needs are governed by a trust."

-6-

Here, however, Jukowski demonstrated that he was utterly unwilling or unable to address CY's acute needs. In circumstances like this, MCL 700.5306(5) recognizes an exception to MCL 700.5306(2), permitting the trial court to grant powers to a guardian over "treatment decisions that the patient advocate is designated to make" if "the patient advocate is not acting consistent with the ward's best interests . . . ." Therefore, the statutory scheme for court-appointed guardianships contemplates that the trial court could appoint a person other than Jukowski to serve as the guardian for an "incapacitated person" such as CY, even though CY made a patient advocate designation. Thus, the trial court acted well within its discretion in appointing a guardian other than Jukowski, despite the existence of a PAD signed by CY.

## D. THE REQUIREMENT TO POST A BOND

CY argues that the trial court erred when it did not order the professional guardian to post a bond pursuant to MCL 700.5106(3). But in the trial court, CY did not mention a requirement of a bond. Our Supreme Court has consistently followed "the time-honored rule that, absent unusual circumstances," issues not presented in the trial court "may not be raised on appeal." *Peterman v Dep't of Natural Resources*, 446 Mich 177, 183; 521 NW2d 499 (1994). Further, on appeal, CY has barely discussed the issue of bond, devoting only the following two sentences to the argument in her appellate brief:

> EPIC requires a newly appointed professional guardian to post bond. MCL 700.5106(3). The record does not seem to indicate that this was done.

Because "[a]n appellant's failure to properly address the merits of [an] assertion of error constitutes abandonment of the issue[,]" the issue of bond is abandoned for purposes of this appeal. *Peterson Novelties, Inc v Berkley*, 259 Mich App 1, 14; 672 NW2d 351 (2003).

Affirmed.

/s/ Christopher P. Yates
/s/ Adrienne N. Young
/s/ Randy J. Wallace

-7-